Filed 9/27/21 A.W. v. Superior Court CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| A.W.,<br><br>　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>　　　Respondent;<br><br>C. et al.,<br><br>　　　Real Parties in Interest. | A162985<br><br>(Contra Costa County Super. Ct. No. J1900115) |

　　　A.W. (mother) petitions this court for writ review of the juvenile court's orders issued at a contested 18-month review hearing (Welf. & Inst. Code, § 366.22)[1] denying reunification services and setting a selection and implementation hearing under section 366.26 for her son (minor). Mother contends the trial court (1) erred in finding there was a substantial risk of detriment in returning minor to her care; (2) should have extended services beyond the statutory timeframe; and (3) erred in reducing visitation. We conclude the juvenile court did not err and deny the petition on the merits.

---

　　　[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

In February 2019, the Contra Costa County Children and Family Services Bureau (Bureau) filed a petition alleging Mother was unable to provide regular care for the minor, then 21 days old, due to her history of substance abuse and failure to take minor for follow-up care, and because minor's umbilical cord tested positive for methamphetamines. The petition further alleged mother's parental rights had been terminated as to minor's half-sibling, C.W.

At the detention hearing, the court, with mother's consent, appointed a guardian ad litem for mother, ordered minor detained, ordered supervised visitation for mother, and ordered services for mother pending further proceedings. Those services included a psychological evaluation and substance abuse treatment. After mother refused to surrender minor or disclose his whereabouts, the court issued a protective custody warrant for minor and an arrest warrant for mother.

Over the course of the next several months, Santa Cruz Sheriff's officers went to maternal grandmother's home several times, but neither mother nor minor was present.

On April 1, the Concord Police Department notified the Bureau they had Mother in custody. Mother stated minor "was with her 'parents.' " However, when officers performed a welfare check at maternal grandmother's home, she stated minor was not there, although officers "heard a baby crying inside" when they first approached the home. Two days later, father[2] contacted law enforcement to report mother missing. Upon officers' arrival at father's address, they found minor and placed the infant in a "licensed foster home the next day, April 4. . . ."

---

[2] Father is not a party to this proceeding.

2

The court recalled the warrant and set a contested jurisdiction hearing, at which the court sustained the petition and set the matter for a disposition hearing.

In its disposition report, the Bureau recommended family reunification services to father, and no services to mother. Although the Bureau "has been known to recommend services for parents who are eligible for bypass," in this case, mother had not "made any efforts to engage in services or mitigate the reasons that [minor] was removed." She had only recently begun drug testing, and she had not completed a psychological evaluation.

At the disposition hearing, the court adjudged minor a dependent of the court, found by clear and convincing evidence there was a substantial danger to minor's physical health, safety, and protection, or physical or emotional well-being, if he were returned home, ordered services and supervised visitation for both parents, and set the matter for a six-month review hearing.

In its six-month status report, the Bureau recommended an additional six months of services for mother. Mother had since had another child, S.W., who remained "in her care under a court-ordered Family Maintenance plan," and she had obtained housing. Minor remained in foster care, was "developing appropriately," and was an "easy, healthy and happy baby." In February 2020, mother began attending parenting classes. A month later, mother began individual therapy, and a month later still, she began attending "NA/AA Zoom meetings." Mother "complied with [the] majority of [drug] testing requirements." She also had supervised visitation with minor once a week for an hour, and the visitation worker reported mother was "fully engaged in all of the visits." The Bureau therefore requested "authority to transition to unsupervised visits" with mother. The social worker noted

3

mother had "made a lot of progress," had "engaged in her sobriety and ha[d] begun to build a supportive team of individuals," and had "demonstrated some new skills and behaviors . . . consistent with case plan objectives."

The court continued minor as a dependent child, ordered continued reunification services, found mother had "made significant progress in resolving problems that led to the child's removal from the home," ordered "consecutive overnight visits with mother for a maximum of 30 days," and set the matter for a 12-month review hearing. However, because of the time elapsed between hearings, the 12-month review hearing became an 18-month review hearing.

In its 18-month review hearing report, the Bureau recommended two more months of services and then termination of mother's services noting its concern over mother's "spiraling mental health." Mother informed a social worker that the Bureau had "stalked on her in the past, stole her son, and had doctor's [*sic*] lie about the result of a drug test 'from her umbilical cord which we stole.' " Additionally, there had been several incidents involving mother "making threats." On several occasions and "at various hours, at 2:00 a.m. and 3:00 a.m.," paternal grandmother reported mother would show up at her house looking for father, who refused to leave with mother because she "would leave him stranded when she became upset with him." When mother came to paternal grandparents' home, she would be "hostile, yelling and screaming" and accused grandmother "of being a child trafficker." She also "call[ed] the home, as well as, texts incessantly to everyone's phone in the home trying to get [father] to respond." Mother had followed minor's caregivers from the courtroom to the parking lot and stated "they were liars, horrible people, and that everything they put in the paperwork was a lie and that [minor] loved her." She had also recorded the caregivers "while they

4

spoke with their attorney by their vehicle." The social worker noted mother had been "unable to demonstrate she understands how her behavioral actions, such as her uncontrollable outbursts, had contributed to concerns . . . regarding her ability to keep [minor] safe when she is challenged with life difficulties." Although mother had "adhered to the majority of her case plan components," she had been "very resistant . . . [to] complete a psychological evaluation."

Finally, although mother reported minor's overnight visits were "going very well," his foster parents reported minor did "not fare well after visitations." He had shown "heightened anxiety," and "regressive behaviors" such as "pulling his hair, kicking, biting, hitting and throwing objects." Minor had also begun "experiencing night terrors," in which he "screams and thrashes around dangerously and [is] unable to awaken." Foster parents reported minor often returned from visits with "a collection of little bites on his back under his diaper," "bites on his butt," and "smelling strongly of cigarettes."

In a February 2021 court memo, the Bureau recommended termination of services to mother and continued to express concerns over mother's "spiraling mental health." Mother's individual therapist reported she could no longer speak to the Bureau "due to directives put in place by [mother]" back in September 2020. After meeting with a social worker, mother had "stood in front of the building and yelled, 'Give me my kid back, Children & Family Services are kidnappers.'" Mother had taken pictures of an injury minor had sustained and "posted photos of [minor's] injury on Facebook . . . once again violating [section] 827, the law protecting privacy."[3]

---

[3] The court had previously ordered mother to "cease and desist" posting details about minor on the Internet and social media.

Although mother had completed a psychological evaluation, she had used an unapproved evaluator. The Bureau received a consultation in regard to the evaluation. The consulting doctor opined that "his main concern with the psychological evaluation was that even though . . . the evaluator indicated that he had access to and reviewed" the various reports, "he did not refer to any of the information contained in those reports" nor did "he specifically address any of the reasons there were concerns about [mother's] psychological stability or well-being in the first place." The evaluation failed to "address [mother's] history with mental health, her history with substance abuse, her history with Domestic Violence and Trauma, nor did it address her criminal history." Finally, mother's evaluator failed to "consult with the Bureau . . . prior to performing the evaluation" and relied on "information provided to him from [mother.]" The Bureau did not accept the evaluation and that component of her case plan therefore remained outstanding.

Mother also repeatedly refused to allow social workers to do home visits, stating the Bureau needed "to call and schedule an appointment to enter her home" despite social workers explaining they could perform unannounced visits as part of her case plan. Due to this, mother's "unsupervised and overnight visits were terminated," and mother instead received supervised visitation at the Bureau. Finally, police reports showed there had been "approximately 9 incidents of domestic violence between [mother] and [father]" within the past four months, including an incident where father had a knife.

A month later, in another court memo, the Bureau noted that since November 2020 mother had not drug tested, and she stopped sending verification of her 12-step meeting attendance. Mother stated she did not think she needed to continue drug testing because "her initial case plan

required that she only test for six months" and "she was confused about continuing her case plan services because her attorney told her the case was set for trial." Mother had also "called in a false report" on minor's caregivers, necessitating a welfare check by the Sherriff's Department. Because mother refused to complete her court-ordered psychological evaluation through a Medi-Cal-approved provider, the Bureau agreed to pay the cost of the evaluation through an outside approved-evaluator. However, as of June 2021, mother had still not complied with the evaluation. Mother was also refusing to work with the Bureau to amend minor's birth certificate—a requirement for him to continue receiving services—because "after one year, Medi-Cal requires that a child's birth certificate reflect his/her given name." Minor's certificate still stated his name as " 'baby boy.' " Mother stated "nothing was wrong with her son, except that he was unhappy in his foster home and wanted to be with her," she did not "want [minor] to receive therapeutic services because he was not in need of them," and that she would "pursue therapy for [minor] once he returns home." Three days after a meeting with the social worker, mother sent out a "mass email stating [the social worker] was verbally abusive toward her and [minor]" and had "physically assaulted" her. Mother requested a new social worker and filed a police report against the worker "for verbal and physical abuse." Supervised visitation was going well, and mother was "age appropriate" and "affectionate" with minor during the visits.

The 18-month review hearing took place over four days and several months, and the court heard from the social worker, mother's therapist, and mother.

The social worker explained things had initially been going well with mother's case plan. Mother had completed parenting classes, had been

7

consistent with random drug testing and attendance at AA or NA meetings up until November 2020, and she had been seeing an individual therapist. Mother had also been consistent with visitation throughout the proceedings, and currently had two hours of supervised visitation per week. However, when the social worker reminded mother she would need to complete a psychological evaluation, mother became "[v]ery upset, very agitated." Mother declined to do the evaluation through Contra Costa Mental Health and instead opted to pay for her own evaluation. The Bureau "did not accept the evaluation" because mother did not have her evaluator "approved and cleared" by the Bureau, requiring mother to obtain a new evaluation.

The Bureau was concerned about mother's "mental health and her not receiving the proper care for it," that there "might be domestic violence between [mother] and . . . father," and that "father seems to be a chronic alcoholic, and has not received any kind of treatment for it recently." The social worker explained the concerns with mother's mental health first arose "when mom started sending a slew of e-mails every day," a lot of which "did not make sense in what she was saying and what she was requesting." Additionally, around mid-September 2020, mother had stopped allowing her therapist to talk to the Bureau "about her progress and all in treatment." Mother had also come to the Bureau on several occasions, "yelling at the building, accusing us of being kidnappers, child stealers, demanding we give her her kids back." In another incident, "she almost hit a [casework assistant] in the parking lot," and started "screaming" at the assistant and "almost hit" the assistant with her car. Mother still had not drug tested since November 2020, even though it had been explained multiple times she still needed to do so.

Mother testified that she "completed everything [the Bureau] listed and . . . went above beyond their expectations of completion." She stated father was "a very good father," that they had "a good relationship," that father had "never pulled a knife" on her, and denied there had been any domestic violence calls. Parents no longer had a "romantic relationship" because the Bureau "kidnapped [their] son when he was first born," and that "put a dent" in parents' relationship. Mother was currently pregnant but refused to discuss the pregnancy because during her pregnancy with minor the Bureau "followed" her "to make a false accusation." She had "no recollection" of father being arrested at her home in May. She could not recall having reported her car stolen by father back in December 2020, she denied ever calling 911 at all in the past six months, and she denied seeing father drunk in the past six months. Mother filed a restraining order against a Bureau social worker because she had "filed a false—two false . . . detention reports, to have both of [her] sons illegally taken" away. Mother believed the social worker "continues to harass" her.

Mother's therapist had seen mother every week since March 2020. She opined that mother was a "fit parent" and did not "ascertain anything" that would cause her to believe mother "would harm [minor] in any way." However, she acknowledged she had "no knowledge of police activity related to [mother] and [father]," and relied on information provided by mother and the initial disposition report to form the basis of her opinions.

The court then heard from counsel. Mother's counsel asserted she had met her burden and "rebutted the presumption of detriment" in returning minor to her. Minor's counsel urged the court to terminate services, stating there had "been sufficient showing that it would detrimental to [minor] if he was returned to his mother." Counsel stated she had "seen an escalation in

9

[mother's] behavior [and] a decompensation of her ability to stay on track," mother had failed to continue drug testing, and had failed to get a psychological evaluation even though these were requirements necessary to complete her case plan, and that these requirements were known to mother since the beginning of minor's dependency proceedings. The Bureau's counsel asserted reasonable services had been provided "over the last two years," that parents "failed to make substantial progress," and that return of minor would be detrimental. Mother had "stop[ped] complying" with her plan, "made several excuses" of why she could not comply, "refused to do the county psych" evaluation, and simply stopped drug testing. "Mother's behavior and mental health stability ha[d] not changed in two years," rather counsel stated she was "still refusing to drug test, she is continuing to be evasive with the Bureau, she is habitually lying, providing false testimony, and has a lack of accountability for her actions."

The court found reasonable services had been offered but mother had made "minimal" progress with her case plan. The court stated this was not "a case where [mother] could be characterized as being all noncompliant or all compliant," rather mother's behavior "evolved over . . . time." The court found mother's therapist "completely lacking in credibility." The court also found mother lacked credibility because some of things mother denied were "very simple and very obvious things that are supported by the evidence." For example, she denied having called 911 but in the 911 calls, identified herself, gave father's name, gave her address, and stated father had stolen her car and that father was drunk and had "threatened to kill himself with a knife." The court found the social worker to be credible, and that mother had not made substantial progress with her case plan, and specifically that mother had missed 24 drug tests since November 2020 and failed to get a

psychological evaluation.  The court terminated services, finding it would be detrimental to minor if he were returned to mother's care and set the matter for a section 366.26 hearing.

**DISCUSSION**

***Substantial Evidence Supports the Juvenile Court's Finding of Detriment***

"The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months.  (§§ 361.5, subd. (a)(3), 366.22, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249. . . .)  At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being.  [Citation.]  'That standard is construed as a fairly high one.  [Citation.]  It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as might have been hoped, or seemed less capable than the available foster parent or other family member.' " (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864 (*Georgeanne G.*), fn. omitted.)

"If the child is not returned to a parent at the permanency review hearing, the court must terminate reunification services and order a hearing pursuant to section 366.26.  [Citation.]  [¶] We review the juvenile court's finding of detriment for substantial evidence." (*Georgeanne G., supra*, 53 Cal.App.5th at p. 864.)  " ' " In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the

11

province of the trial court." [Citation.] "We do not reweigh the evidence or exercise our independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Mother maintains she "participated in all aspects of her treatment plan," there "was no showing [she] did anything detrimental to the minor during contact with [him]," and she "only became agitated when the Bureau requested a psychological evaluation," however, returning minor "would likely reduce her anxiety and might even eliminate the Bureau's persistence in her obtaining one."

While mother did well with her case plan initially, her progress steadily diminished over the course of the proceedings. In making a finding of a detriment, the court went through a long recitation of facts that supported its determination: there was evidence of "extensive domestic violence" between mother and father; mother had a history of drug use but adamantly denied minor tested positive for methamphetamine; there was documented "conduct" of mother's "spiraling mental health," including her "[y]elling in front of the courthouse, Posting of [minor's] injuries on the Internet" despite a court order to cease and desist, and the refusal to allow the therapist to give the social worker any updates; mother had missed 24 drug tests since November 2020 and had stopped sending verification of her attendance of AA/NA meetings; and finally, even after the Bureau's "compromise . . . to pay for the psych eval from the company" mother wanted, she still had not obtained an evaluation. Despite mother's claim that she "participated in all aspects of her treatment plan," the evidence is to the contrary.

12

Mother's assertion that minor's return would "likely reduce her anxiety and might even eliminate the Bureau's persistence in her obtaining" an evaluation is speculative and not a basis for return.

Because substantial evidence supports the juvenile court's finding of detriment, the court did not err in refusing to return minor to mother, and termination of reunification services was required. (§ 366.22, subd. (b).)

*Continuing Reunification Services*

Mother acknowledges there is "no express authority" for a "period of services to be ordered at an 18-month hearing," but contends the court had "authority" to do so as "long as it was not contrary to the best interests" of minor. She maintains there "has been no showing that extending services would be detrimental."

"Sections 361.5, subdivision (a)(4)(A) and 366.22, subdivision (b), authorize the juvenile court to extend reunification services beyond the 18-month statutory period in certain limited circumstances." (*Georgeanne G., supra,* 53 Cal.App.5th at p. 864, fn. 9.) None of those circumstances is present in this case.[4] "There are also cases in which appellate courts have

---

[4] Section 361.5, subdivision (a)(4)(A) provides, "court-ordered services may be extended up to a maximum time period not to exceed 24 months after the date the child was originally removed from physical custody of the child's parent . . . if it is shown . . . that the permanent plan for the child is that the child will be returned and safely maintained in the home with the extended time period. The court shall extend the time period only if it finds it is in the child's best interest to have the time period extended and that there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . , or that reasonable services have not been provided to the parent. . . . If the court extends the time period, the court shall specify the factual basis for its conclusion that there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . within the extended time period."

13

ruled reunification services may be continued beyond the 18-month statutory period, but those cases involved truly exceptional situations in which some external factor thwarted the parent's efforts at reunification.  (See e.g., *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787, 1796 . . . [mother was hospitalized during most of reunification period, and after her release,  the child welfare agency attempted to restrict visitation]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1209, 1212–1214 . . . [the Department's reunification services for the father were a 'disgrace']; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777–1778 . . . [no reunification plan was ever developed by the child welfare agency for the father].)"  (*Georgeanne G.,* at p. 864, fn. 9.)  None of those exceptional situations is present here.

Further, even if any of those circumstances or exceptional situations were present, mother has actually received 24 months of reunification services[5]–as the Bureau observes, "exceed[ing] all statutory timelines for reunification."

---

Section 366.22 provides for additional services to those parents "in a court-ordered residential substance abuse treatment program, a parent who was either a minor parent or a nonminor dependent parent at the time of the initial hearing," or "a parent recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security."  (§ 366.22, subd. (b); Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021) § 2.129 ["the juvenile court may extend services to a date twenty-four months from the original removal of the child in certain very limited circumstances pertaining to parents in substance abuse programs, parents who were either a minor parent or a nonminor dependent parent, parents recently released from incarceration or institutionalization, and parents who have been in the custody of the United Stated Department of Homeland Security"].)

[5]  The Bureau filed its petition on February 1, 2019, and a detention hearing took place three days after on February 4, at which the court ordered minor detained, and ordered services to be provided to mother "pending further proceedings."  At the continued detention hearing, the following day,

14

Mother claims that California law is based on outdated federal law, and that in 2018 Congress amended title 42 United States Code 629a(a)(7) to "eliminate time limits for reunification services." She contends her case "seems like an appropriate case for the court to have considered the federal law while exercising its discretion."

This argument is unavailing. Mother did not raise this issue in the juvenile court, and it is therefore waived. Moreover, mother does not explain how the change in the federal law altered the analysis required by state law as applied to this case, nor has she demonstrated any likelihood that the juvenile court's order would have differed if not bound by the time limits set forth in California statutes. Finally, mother provides no authority that the federal statute, which is silent on the duration of reunification services in the circumstances of this case, eliminates the time limits set forth in the California statute. Title 42 United States Code 629a(a)(7) defines "Family reunification services" and does not mention any "elimination of time limits for reunification services" under California law.[6]

---

the court once again ordered minor detained and ordered services "pending further proceedings." However, mother failed to follow the courts order to surrender minor. After a month-long delay, minor was not physically detained until April 3. At the November 2019 disposition hearing, the court ordered services for mother. The court concluded the 18-month review hearing at the end of June 2021. "The detention hearing essentially marks the beginning of the maximum 18-month reunification period (which can be extended to 24-months in very limited situations) that starts at the time the child is originally removed from the physical custody of his or her parent. . . ." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, § 2.44, citing §§ 361.5, subd. (a), 366.21, subd. (g)(1), 366.22, subd. (a).) Thus, even under the most generous calculation of time—from the November 2019 hearing—mother has received 24 months of services.

[6] Title 42 United States Code 629a(a)(7) states "The term 'family reunification services' means the services and activities described in subparagraph (B) that are provided to a child that is removed from the child's

15

*Visitation*

Finally, mother contends the trial court abused its discretion in reducing her visitation from two hours per week to one hour per month.

The Bureau contends mother waived any right to "seek relief from this court" regarding visitation because she failed to object to the visitation order in the juvenile court. Mother maintains "[w]hile counsel . . . did not specifically object to the visitation order she objected to the recommendation and the visitation order was contained therein."

Regardless of any forfeiture, the juvenile court did not abuse its discretion in reducing mother's visitation with minor.

Citing *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504, mother notes prior visits had gone well and contends "absent a showing of detriment," visitation should not be reduced. Mother's reliance on *Hunter S.* is inapposite. That case involved the issuance of a visitation order "delegating the discretion as to whether any visits occurred" to the child, who subsequently prevented visitation by refusing to see his parents. (*Id.* at pp. 1507–1508.) The court held, "Even after family reunification services are terminated, visitation must continue unless the court finds it would be detrimental to the child. (§ 366.21, subd. (h).)" (*Hunter S.,* at p. 1504.) Here, the court allowed visitation to continue, albeit at a reduced rate. As to its frequency, the juvenile court has "great discretion in deciding issues relating to parent-child visitation," the exercise of which "we will not disturb on

home and placed in a foster family home or a child care institution or a child who has been returned home and to the parents or primary caregiver of such a child, in order to facilitate the reunification of the child safely and appropriately within a timely fashion and to ensure the strength and stability of the reunification. In the case of a child who has been returned home, the services and activities shall only be provided during the 15-month period that begins on the date that the child returns home."

appeal unless the juvenile court has exceeded the bounds of reason." (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.)

When reunification services end, "the parents' interest in the care, custody and companionship of the child [is] no longer paramount," and " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The permanency planning hearing had been set and mother had received over 24 months of services. At that point the focus shifted to minor's best interest, and we see no abuse in discretion in the juvenile court's order reducing (but not terminating) mother's visits with minor.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (Welf. & Inst. Code, § 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452(h).) The request for stay is denied, and this decision shall be final immediately in the interests of justice. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____

Banke, J.

We concur:

_____

Margulies, Acting P.J.

_____

Sanchez, J.

A162985, AW v. Superior Court